UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

GEORGE DALE, COMMISSIONER OF INSURANCE FOR
THE STATE OF MISSISSIPPI, IN HIS OFFICIAL
CAPACITY AS RECEIVER OF FRANKLIN PROTECTIVE
LIFE INSURANCE COMPANY, FAMILY GUARANTY LIFE
INSURANCE COMPANY, AND FIRST NATIONAL LIFE
INSURANCE COMPANY OF AMERICA,

SCOTT B. LAKIN, DIRECTOR OF THE DEPARTMENT OF
INSURANCE FOR THE STATE OF MISSOURI, IN HIS
OFFICIAL CAPACITY AS RECEIVER OF INTERNATIONAL
FINANCIAL SERVICES LIFE INSURANCE COMPANY,

CARROLL FISHER, INSURANCE COMMISSIONER FOR THE
STATE OF OKLAHOMA, IN HIS OFFICIAL CAPACITY AS
RECEIVER OF FARMERS AND RANCHERS LIFE
INSURANCE COMPANY,

MIKE PICKENS, INSURANCE COMMISSIONER FOR
THE STATE OF ARKANSAS, IN HIS OFFICIAL
CAPACITY AS RECEIVER OF OLD SOUTHWEST LIFE
INSURANCE COMPANY                                        PLAINTIFFS

VS.                                    CIVIL ACTION NO. 3:00CV359LN

ALA ACQUISITIONS I, INC., ET AL.                         DEFENDANTS


MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of plaintiffs
for judgment on the pleadings with respect to the eleventh and
eighteenth affirmative defenses pled by defendant Dreyfus Service
Corporation (Dreyfus).  Dreyfus has responded in opposition to the
motion and the court, having considered the memoranda of
authorities submitted by the parties, concludes that the motion
should be granted.

As characterized by plaintiffs, this case arises out of a scheme masterminded by Martin Frankel to "loot" more than $200 million from seven insurance companies.  The plaintiffs are the Commissioners and Directors of the Departments of Insurance for the states of Mississippi, Tennessee, Missouri, Oklahoma and Arkansas, in their official capacities as the liquidators/ receivers/rehabilitators of the seven insurance companies (hereafter collectively referred to as Plaintiff Receivers), and the defendants are Martin Frankel and numerous individuals, foundations, trusts and corporations, including Dreyfus, alleged to have been involved in the scheme in one way or another.[1]

According to plaintiffs, Frankel's scheme to defraud the insurance companies began in 1991, lasted nearly ten years, involved the participation of dozens of co-conspirators and ultimately resulted in the insolvency of the Insurance Companies. The scheme, detailed in the complaint and plaintiffs' RICO statement, generally worked as follows.  Frankel obtained control of the Insurance Companies and once in control, placed two of his co-defendants in positions of authority as CEO and CFO, respectively.  Those defendants then stole the Insurance Companies' money through a series of financial transactions.  To

---

[1]     This court previously entered an opinion granting in part and denying in part a motion by the Receivers for judgment on the pleadings.  See Dale v. Ala Acquisitions I, Civil Action no. 3:00CV359LN (S.D. Miss. Jan. 21, 2005).  The court's recitation of the facts and allegations herein is taken from that opinion.

commit their fraud without detection, Frankel created sham companies, used alias identities and had numerous mailing addresses for phony companies and identities.  These defendants transferred the money from the insurance companies to banks or brokerage houses in the United States and from there, transferred the money to foreign banks, usually in Switzerland.  They then transferred the money back to the United States where it was converted to untraceable cash for their own use and to fund their fraudulent scheme.

Regarding Dreyfus, the complaint alleges that between 1994 and 1999, Frankel, using the alias "Eric Stevens," opened at least thirteen accounts at Dreyfus in the names of LNS, Inc. and IFC jointly, or LNS, Inc. alone, and used those accounts to loot and launder the Insurance Companies' funds through wire transfers to and from an account in the name of Bloomfield Investments that he controlled at Banque SCS Alliance in Switzerland.  Frankel, the complaint alleges, controlled all of the Dreyfus accounts and gave standing wire instructions to Dreyfus directing how the Insurance Companies' funds were to be transferred to the Swiss account, pursuant to which over $480 million was wired from the Dreyfus accounts to Frankel's Swiss bank.

The complaint charges that despite knowledge that all the funds in the accounts belonged to the Insurance Companies, Dreyfus allowed "Stevens," as the purported president of LNS, Inc., to

transfer hundreds of millions of dollars from the accounts to
Switzerland without doing any due diligence, such as requesting
standard information from the Insurance Companies like board
resolutions or other documentation authorizing "Stevens" to
control the accounts or showing the purported relationship between
the Insurance Companies and LNS, Inc. or "Stevens."  Further,
based on allegations that Dreyfus knew that funds from the
accounts were wired to the Swiss bank through a complex series of
extraordinary transfers, that funds were held in the Dreyfus
accounts for only a short period of time, that the Insurance
Companies' funds were co-mingled in the account held in the name
of LNS, Inc., that attempts were made to disguise the source of
funds that were being transferred, and that little or no trading
activity occurred in the accounts, plaintiffs charge that Dreyfus
knew that money laundering or other illegal activity was occurring
in the accounts, and thus, plaintiffs have charged Dreyfus with
violating the Racketeering Influenced and Corrupt Organizations
Act, 18 U.S.C. § 1962(d), negligence, breach of contract and
breach of fiduciary duty.

Dreyfus has alleged that even if it was negligent and its
negligence could be found to have proximately contributed to the
loss suffered by the Insurance Companies, the negligence of
others, including the Insurance Regulators, also contributed to

4

the loss.[2]  That is, part of Dreyfus's defense to the Receivers'
allegations against it is that the Receivers themselves (in their
capacity as Insurance Regulators) should have recognized and
halted Frankel's scheme and thus, in its eleventh and eighteenth
defenses, Dreyfus declares that "the culpability of the regulators
must be established in any apportionment of fault."

The court previously denied a motion by the Receivers to
strike Dreyfus's apportionment of fault defense, finding that the
Receivers had failed to adequately establish that such a defense
could not properly be asserted by Dreyfus under applicable law.
More to the point, the court found that whereas the Receivers had
asserted that New York law applies to their claims against Dreyfus
and to its defenses to those claims, they had not directly
addressed "whether there is any conflict of law on the question of
the availability of apportionment of fault on the facts presented
as an affirmative defense under any state's laws." Dale v. ALA
Acquisitions, Inc. I, Civil Action No. 3:00CV359LN, slip op. at
10.  The court did "recognize[] the very real potential that an

_____

[2]      As the court made clear in the previous opinion, the
Plaintiff Receivers herein have brought this action solely in
their capacity as receivers for the Insurance Companies, and not
in their capacity as insurance regulators.  They contend, and
Dreyfus agrees, that the plaintiff Insurance Commissioners and
Directors are parties only in their capacity as receivers and are
not parties in their regulatory capacity, and they thus agree that
any negligence by the Insurance Commissioners and Directors in the
exercise of their regulatory functions cannot be imputed to
plaintiffs in their capacity as receivers for the Insurance
Companies.

5

apportionment of fault defense . . . may not be available to Dreyfus based on the Regulators' negligence, particularly under New York law, but conclude[d] that since this position ha[d] not been pursued by Plaintiff Receivers, it [would] not be resolved by the court." Id. at 11 n.4.  The Receivers have now moved for judgment on the pleadings as to the sole issue of whether apportionment of fault is available to Dreyfus.  They assert that even if the Regulators acted negligently in connection with the Insurance Companies, as a matter of law, Dreyfus is not permitted to ask the jury to apportion fault to the Regulators on the Receivers' negligence-based claims.[3]

     As the parties recognize, whether apportionment is available is fundamentally a choice of law issue:  Mississippi law, the application of which is advocated by Dreyfus, would allow apportionment in such circumstances whereas New York law, which the Receivers contends applies, would not.

     In a federal question action where the federal court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law riles of the forum state. In re Combustion, Inc., 960 F. Supp. 1056, 1059 (W.D. La. 1997)

---

     [3]     Plaintiffs emphasize that their motion is directed to Dreyfus's apportionment of fault defense only in relation to their negligence-based tort claims, not the RICO or contract claims, to which apportionment is clearly inapplicable.

(citations omitted).  <u>See also</u> <u>Gann v. Fruehauf Corp.</u>, 52 F.3d 1320, 1324 (5th Cir. 1995).

"Choice of law analysis becomes necessary only when there is a true conflict between the laws of two or more states, each having an interest in the litigation."  <u>Zurich American Ins. Co. v. Goodwin</u>, 920 So. 2d 427, 432 (Miss. 2006) (citing <u>Boardman v. United Servs. Auto. Ass'n</u>, 470 So. 2d 1024, 1038 (Miss. 1985)); <u>see also</u> <u>Chapman v. Thrasher Trucking Co.</u>, 729 F. Supp. 510 (S.D. Miss. 1990) (stating that "[b]efore it becomes necessary that the court make a choice of law, it must appear that there is a conflict between the substantive law of the involved states as to a matter that would have a significant effect on the outcome of the case").

The parties apparently agree there is a conflict between Mississippi law and New York law on the subject of apportionment of fault.  If Mississippi law were found to apply, then if Dreyfus were to prove that the nonparty Regulators were negligent and that their negligence contributed to the loss of the monies that passed through the subject Dreyfus accounts, Dreyfus would be entitled to have the fact-finder apportion percentages of fault to the Regulators pursuant to Mississippi Code Annotated § 85-5-7, even though the Regulators are otherwise legally immune from tort suits for damages.  Subsection (2) of § 85-5-7 states that "in any civil action based on fault, the liability for damages caused by two (2)

7

or more persons shall be several only, and not joint and several
and a joint tort-feasor shall be liable only for the amount of
damages allocated to him in direct proportion to his percentage of
fault."[4]  The statute specifically provides that

> [i]n actions involving joint tort-feasors, the trier of
> fact shall determine the percentage of fault for each
> party alleged to be at fault without regard to whether
> the joint tort-feasor is immune from damages.  Fault
> allocated under this subsection to an immune tort-feasor
> or a tort-feasor whose liability is limited by law shall
> not be reallocated to any other tort-feasor.

See also Entergy Miss., Inc. v. Hayes, 874 So. 2d 952, 958 (Miss.
2004) (concluding it was proper to allow allocation of fault to
immune, nonparty tortfeasor).

     In contrast to Mississippi law, New York law permits
apportionment of fault to a nonparty only "for non-economic loss"
in "an action or claim for personal injury," and even then, only
in limited circumstances.  See McKinney's CPLR § 1601 (providing

---

[4]     The section broadly defines "fault" to include "an act
or omission of a person which is a proximate cause of injury or
death to another person or persons, damages to property, tangible
or intangible, or economic injury, including, but not limited to,
negligence, malpractice, strict liability, absolute liability or
failure to warn," but to exclude "any tort which results from an
act or omission committed with a specific wrongful intent."  Miss.
Code Ann. § 85-5-7(1).  An exception to the rule of "several only"
liability, which is irrelevant here, is found in subsection (4) of
the statute, which provides that "[j]oint and several liability
shall be imposed on all who consciously and deliberately pursue a
common plan or design to commit a tortious act, or actively take
part in it," and "[a]ny person held jointly and severally liable
under this section shall have a right of contribution from his
fellow defendants acting in concert."  Miss. Code Ann. § 85-5-
7(4).

that liability of a defendant to a personal injury claimant for non-economic loss, where such defendant's liability is found to be 50% or less of the total liability assigned to all persons liable, "shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss," except there will be no apportionment of fault to any nonparty over whom the plaintiff proves he was unable to obtain jurisdiction); see also Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1372 n.6 (N.Y. 1992) (§ 1601 provides that "a tortfeasor whose culpability is apportioned at 50% or less is liable only for its proportionate share of noneconomic loss (e.g., pain and suffering, mental anguish)"). As this is not a personal injury action and the damages involved are economic, it follows that if New York law were found applicable, Dreyfus could not reduce its liability by apportioning fault to the Regulators. See Sommer, 593 N.E.2d at 1372 & n.6 (§ 1601 "is applicable only in personal injury actions" and thus did not apply to claim asserting property damages).

If it is determined there is a true conflict, then, as the court explained in Goodwin, "[c]hoice of law analysis involves a multi-step process." 920 So. 2d at 433. The first step is to determine whether the conflicting laws are substantive or procedural, because "[r]egardless of the substantive law to be applied, Mississippi courts will apply their own procedural law."

Id. (citing Ford v. State Farm Ins. Co., 625 So. 2d 792, 793 (Miss. 1993)).  Although the Receivers argue that Mississippi's law on apportionment of fault is procedural, it plainly is not. As the court in Goodwin observed, "few laws are classified as procedural," and other than the Mississippi Rules of Civil Procedure and Rules of Evidence, the Mississippi Supreme Court has "only found the definition of 'procedural' to include statutes of limitations, awards of attorney's fees and awards of prejudgment interest."  Id.

The apportionment statute at issue here does not merely prescribe a procedure, but rather a substantive right of a defendant to a reduction in its liability for fault that is fairly attributable to others and not to it.  See Kreiser v. Hobbs, 166 F.3d 736, 739 (5th Cir. 1999) (applying § 85-5-7 after stating that "for a diversity action, we apply state substantive law"). Moreover, in terms of intendment and effect in general, apportionment of fault is analogous to principles of comparative negligence, which have been held to be substantive.  See Petersen v. Klos, 426 F.2d 199, 202 (5th Cir. 1970) (recognizing that "that the Mississippi comparative negligence statute, 'is part of the substantive law of Mississippi'")( citations omitted).  The Mississippi Supreme Court similarly considers the right to contribution among tortfeasors to be substantive.  Estate of Hunter v. GMC, 729 So. 2d 1264, 1276 (Miss. 1999).

Furthermore, courts from other states consistently hold that laws on apportionment of fault are substantive, not merely procedural.  <u>See</u>, <u>e.g.</u>, <u>Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978</u>, 954 F.2d 1279, 1992 A.M.C. 913, 35 Fed. R. Evid. Serv. 1204, 22 Envtl. L. Rep. 20835 (7th Cir. 1992) (holding that question of whether defendant tortfeasors were entitled to reduction in plaintiffs' claims by amount of alleged nonparty tortfeasor's responsibility "was one of substantive law"); <u>Clawans v. United States</u>, 75 F. Supp. 2d 368, 374 (D.N.J. 1999) (applying conflicts analysis to issue of apportionment of fault to determine whether Maryland or New Jersey law substantive law governed); <u>Stingley v. Raskey</u>, 1995 WL 696591, at *7 (D. Alaska 1995) (describing right of third-party plaintiff to an equitable apportionment of fault between all parties as substantive right); <u>Federated Mut. Ins. Co. v. Gray</u>, 475 F. Supp. 679, 680 (E.D. Mo. 1979) (holding that right of one joint tortfeasor to implead a second joint tortfeasor and have the jury apportion the damages according to their relative degrees of fault was not merely a procedural right but a substantive right).

Having determined that the issue under consideration is substantive, a decision is required as to what state's substantive law will apply to the issue at hand.  For conflicts analysis, Mississippi relies on the "center of gravity" doctrine of the

11

<u>Restatement (Second) of Conflicts of Laws</u>, which the Mississippi

Supreme Court described in <u>Mitchell v. Craft</u>, as follows:

> This doctrine is a rule whereby the court trying the
> action applies the law of the place which has the most
> significant relationship to the event and parties or
> which, because of the relationship or contact with the
> event and parties, has the greatest concern with the
> specific issues with respect to the liabilities and
> rights of the parties to the litigation.

211 So. 2d 509, 514-15 (Miss. 1968).  <u>See</u> <u>Goodwin</u>, 920 So. 2d at

433; <u>see also</u> <u>Powe v. Roy Anderson Const. Co.</u>, 910 So. 2d 1197,

1201 (Miss. Ct. App. 2005) (explaining that the "significant

relationship" test is also often referred to as the "center of

gravity" analysis).

However, because "[e]ach area of law, whether tort, property

or contract, has its own analytical provisions" for ascertaining

the "center of gravity," "[t]he second step in choice of law

analysis is to classify the substantive area of law." <u>Goodwin</u>,

920 So. 2d at 433.[5]  As the question for consideration here is

whether Dreyfus may attempt to reduce its own liability for its

alleged negligence by asking the jury to apportion fault to the

nonparty Regulators for their alleged negligence, the conflict

involves a tort issue.

_____

> [5]   Under Mississippi's choice-of-law principles, "[t]he law
> of a single state will not necessarily control every issue in a
> case, and therefore a choice of law must be made as to each issue
> presented with the result that in some instances the law of more
> than one state will be applied in a given lawsuit." <u>Chapman v.
> Thrasher Trucking Co.</u>, 729 F. Supp. 510, 511 n.1 (S.D. Miss. 1990)
> (citations omitted).

In conflicts of law questions for an action sounding in tort, Mississippi applies the factors outlined in Section 145 of the Restatement (Second) of Conflicts of Laws, which provides as follows:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties,
> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are evaluated according to their relative importance with respect to the particular issue.

Powe v. Roy Anderson Const. Co., 910 So. 2d at 1201 (citing McDaniel v. Ritter, 556 So. 2d 303, 310 (Miss. 1989)).  Section 6 of the Restatement (Second) Conflicts of Law provides as follows:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the

13

law to be applied.

In the court's opinion, considering all these factors as they are relevant, it is apparent that the center of gravity is New York.

Initially, Dreyfus notes that the Restatement (Second) § 6 provides that a court "will follow a statutory directive of its own state on choice of law," and it argues that the court's conflicts inquiry begins and ends with § 85-5-7 itself, which includes such a "statutory directive" that Mississippi law applies to the issue at hand, providing, as it does, for apportionment of fault "in any civil action based on fault. . . ."  According to Dreyfus, a statute may embody a controlling directive as to applicable law, even where it does not include an explicit reference to choice of law, so long as the legislation, or policy evidenced therein, reflects an intent as to choice of law.  See Restatement (Second) § 6, cmt. b ("The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. . . . Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.").  The court, however, rejects Dreyfus's contention that the phrase, "In any civil action," amounts to or embodies a legislative determination or directive as contemplated by Restatement (Second) § 6.

14

As the Receivers correctly note, generic, prefatory language
such as this is not considered sufficient to establish a
"statutory directive" on choice of law.  This is evidenced
principally by the Mississippi Supreme Court's decisions in
Mitchell v. Craft, 211 So. 2d 509, 513-16 (Miss. 1968), and
McDaniel v. Ritter, 556 So. 2d 303, 316-17 (Miss. 1989).  In both
cases, notwithstanding that the comparative negligence statute at
issue began with the phrase, "In all actions hereafter brought for
personal injuries," and notwithstanding that both cases recognized
the applicability of Restatement (Second) § 6 to conflicts
analyses, the court conducted a full-blown center of gravity
conflicts analysis.  Although it acknowledges this, Dreyfus argues
that the failure of the court in Mitchell and McDaniel to comment
on the opening phrase of the statute "is meaningless in light of
[its] overall analysis" of the center of gravity issue.[6]  The
relevant point, though, is that the court in Mitchell and McDaniel
found it necessary to conduct a center of gravity analysis despite
prefatory language reciting that the statute there under
consideration applied "In all actions hereafter brought for

_____

[6]      In response to Dreyfus's reasoning in support of its
argument that § 85-5-7 reflects a legislative determination that
it is truly to apply "in all civil actions," the Receivers note
that the statutes at issue in Mitchell and McDaniel related to
remedies, as does § 85-5-7; that the "In all actions hereafter
brought for personal injuries" language at issue in Mitchell and
McDaniel was no less encompassing than the "In any civil action"
language of § 85-5-7; and that the legislature's scope of
authority in enacting all these statutes was the same.

personal injuries."  The court plainly did not consider that
prefatory language dispositive of the choice of law issue, and
neither does this court consider the "In any civil action"
language here determinative.[7]

Dreyfus next submits that even if Mississippi's allocation of
fault rules are considered substantive, this court need not bother
with a full center of gravity choice of law inquiry because even
if center of gravity principles would otherwise suggest

_____

[7]     The Receivers point out that whereas they have
identified a number of cases, both from Mississippi and other
states, that have applied a full conflicts analysis in cases where
the forum state had a statute with language similar to the
introductory phrase of § 85-5-7, Dreyfus has identified no case
from Mississippi or elsewhere that has found similar prefatory
language to be a statutory directive on choice of law.

This court is aware of at least one case where a court
implicitly found similar language determinative of the choice of
law issue.  In In re Wallace Bookstores, Inc., 317 B.R. 709, 713
(Bankr. E.D. Ky. May 25, 2004), the court, albeit without
mentioning § 6, held that Kentucky's comparative fault statute,
which provided for allocation of "fault" between all tortfeasors,
applied "by its own terms, '[i]n all tort actions'," and the court
did not undertake any further choice of law analysis.  There are
many more cases, however, where the courts found a full conflicts
analysis necessary notwithstanding a statute's inclusion of "in
any civil action"-type language.  See, e.g., Boyd Rosene and
Assocs., Inc. v. Kansas Mun. Gas Agency, 174 F.3d 1115, 1117-1118
(10th Cir. 1999) (holding that district court should have applied
Kansas law regarding attorney's fees despite Oklahoma statute
which recited, "In any civil action to recover. . . ."); Ryan v.
Ford Motor Co., 334 F. Supp. 674, 675 (E.D. Mich. 1971) (applying
Montana law on availability of prejudgment interest, despite
Michigan statute "providing for interest from the date of filing
in any civil action"); Chang v. Chang, CV0440198722S, 2004 WL
2095116, at 3 (Conn. Super. Ct. Aug. 16, 2004) (applying Florida
law on punitive damages despite Connecticut statute reading, "In
any civil action to recover damages").

application of New York laws on apportionment of fault,
Mississippi's law on apportionment of fault would nevertheless
apply based on the principle that "no foreign state's substantive
law will be enforced in courts of this state where to do so would
be offensive to the deeply ingrained or strongly felt public
policy of this state."  Boardman v. United Servs. Auto. Ass'n, 470
So. 2d 1024, 1038 (Miss. 1985) (citing Mitchell v. Craft, 211 So.
2d 509, 513-16 (Miss. 1968) (refusing to enforce the Louisiana
contributory negligence rule in the face of this state's
longstanding comparative negligence statute), and McNeal v.
Administrator of McNeal's Estate, 254 So. 2d 521 (Miss. 1971)
(refusing to allow enforcement in this state of the Louisiana
direct action statute in the face of the strong public policy of
this state precluding intra-family tort actions).  See also
McDaniel v. Ritter, 556 So. 2d 303, 316 (Miss. 1989)
("Notwithstanding that another state may have the most significant
relationship to a given issue, we have expressed our reluctance to
enforce the law of that state where such would be offensive to the
deeply ingrained or strongly felt public policy of this state.").

    Dreyfus argues that "[t]he procedures ordained by § 85-5-7
manifest a strongly felt public policy regarding the need to limit
the unfair effects of traditional joint and several liability
procedures in complex cases," a policy that is at least as
deserving of deference and protection as those at issue in

Mitchell (comparative negligence) and McNeal (intra-family immunity), and that "[s]tripping individual defendants of the protection conferred by the statute . . . is offensive to [Mississippi's] strongly endorsed public policy."

For at least two reasons, the court rejects Dreyfus's position. First, as this court has explained, "the public policy exception in the conflicts arena is intended to effectuate the forum state's concern for and interest in protecting its residents." Broadhead v. Hartford Cas. Ins. Co., 773 F. Supp. 882, 904 (S.D. Miss. 1991); see also Mitchell, 211 So. 2d at 514 (observing that "[t]his state is especially concerned with the protection of its injured domiciliaries and their families, and the distribution of its domiciliaries' estates," and that "[t]he comparative negligence statute of this State has been effectively administered for many years and we have an interest in applying it to Mississippi residents"); Gann v. Fruehauf Corp., 52 F.3d 1320, 1325 n.4 (5th Cir. 1995) (stating that "[w]here the specific public policy issue involves a non-resident . . ., Mississippi courts have held that its public policy concerns are not implicated"); Perry v. State Farm Mut. Auto. Ins. Co., 606 F. Supp. 270, 274 (N.D. Miss. 1985) (public policy did not require application of Mississippi stacking laws since the plaintiffs and their decedent were not residents of Mississippi); cf. Villarreal v. Superior Court of Los Angeles, 2004 WL 902114, at *3 (Cal. App. April 28,

18

2004) (finding that California had a substantial interest in its rule of joint and several liability for economic damages in order to make sure that "resident plaintiffs receive all of the damages to which they are entitled since the economic impact of any shortfall will be felt in California'").

Secondly, as the court made clear in <u>Boardman</u>, while all of this state's statutes presumably reflect the public policy of this state, not all of the state's statutes reflect policies so "deeply ingrained" and "strongly felt" that they will trump the substantive law of another state that is the center of gravity. The <u>Boardman</u> court stated:

> We, nevertheless, have and enforce choice of law rules which from time to time allow the positive substantive law of this state to be set aside in favor of the laws of another state possessing greater contacts with the parties and the action. . . .
> Every choice of law problem, by definition, arises out of a situation where the substantive law of the competing state differs from that of this state. Because of this and because every law of this state presumably reflects the public policy of this state, we are caught in a Catch-22. The way out is a recognition that some of our laws reflect public policies which are more fundamental and more inviolable than others.

470 So. 2d at 1038–1039; <u>see also</u> <u>Rieger v. Group Health Ass'n</u>, 851 F. Supp. 788, 793 (N.D. Miss. 1994) (finding that Maryland law which capped punitive damages awards applied where plaintiff failed to come forward with some tangible support that Mississippi would regard statutory caps on noneconomic damages offensive to our fundamental public policy priorities); <u>Superfos Invest., Ltd.</u>

19

v. Firstmiss Fertilizer, Inc., 809 F. Supp. 450, 454-55 (S.D. Miss. 1992) (stating that the mere fact that the legislature enacted a statute is not determinative of whether that statute represents "such an important public policy of Mississippi that a contrary law from another state can never be applied," and emphasizing that "only those laws which represent fundamental and 'deeply ingrained' public policy must be given effect").

The Mississippi Supreme Court did hold in Mitchell that because of its strong interest in protecting the state's residents, it would apply Mississippi's comparative negligence rules. The manifest purpose of Mississippi's apportionment statute is the protection of defendants, and the simple fact is, Mississippi has no interest in protecting nonresident defendants such as Dreyfus. See Villarreal v. Superior Court of Los Angeles, 2004 WL 902114, at *3 n.4 (Cal. App. April 28, 2004) (rejecting argument that forum state, whose law provided for apportionment of fault among all tortfeasors, had an interest in protecting nonresident defendant merely because that defendant did business in the state). The court doubts Mississippi would find it objectionable, or repugnant to any "strongly felt" policy of this state, to apply New York law, which would allow for greater compensation for the Mississippi plaintiffs herein from a New York domiciliary.

20

Moreover, the court is not persuaded that § 85-5-7 represents a "fundamental" or "deeply ingrained" public policy of this state. Granted, the statute now provides for pure comparative fault and several liability, as opposed to joint and several liability, but that is a relatively recent innovation (hardly a long-standing, "deeply ingrained" policy comparable to this state's comparative negligence rules, which have been in place for nearly a century), and has been a gradual innovation.  In fact, as the Receivers point out, the version of the statute in 2001, when this suit was filed, provided for joint and several liability up to fifty percent, and represented a legislative "compromise" between full joint and several liability and pure comparative fault to ensure that a plaintiff would receive fifty percent of his recoverable damages.  See Classic Coach, Inc. v. Johnson, 823 So. 2d 517, 527 (Miss. 2002).  The concept of allocating fault to a nonparty is also a recent innovation in Mississippi.  Indeed, prior to 1989, state law allowed for contribution only among joint judgment debtors.  See Adkinson v. International Harvester Co., 975 F.2d 208, 217 (5th Cir. 1992) (citing Miss. Code Ann. § 85-5-7(4), which was repealed in 1989).  Given these facts, it cannot be said that Mississippi's allocation of fault rules ought apply on public policy grounds, irrespective of whether they would otherwise apply under a center of gravity analysis.

21

Under Mississippi's center of gravity analysis, the
substantive law of the place of injury will usually control,
"unless another state has a more significant relationship to the
occurrence and the parties." Denman by Denman v. Snapper Div.,
131 F.3d 546, 549 (5th Cir. 1998) (citing Allison v. ITE Imperial
Corp., 928 F.2d 137, 141-42 & n.4 (5th Cir. 1991)).  To determine
whether another state has a more significant relationship, the
court looks to the factors identified as relevant by Restatement
(Second) §§ 145 and 6.[8]

The injury at issue here, i.e., the loss suffered by the
Insurance Companies, occurred in part in Mississippi, because
three of the Insurance Companies were domiciled here.  However,
losses were also suffered by the Insurance Companies domiciled in
Oklahoma, Missouri and Arkansas, so that the injury occurred in
several states.  The location of the injury is less important
where the injury did not occur "in a single, clearly
ascertainable, state." Restatement (Second) 145 cmt. e.

The conduct which is alleged by the Receivers to have caused
that injury, however, occurred primarily in New York, where
Dreyfus is headquartered, and where the accounts at issue were

_____

[8]    Dreyfus suggests that most of the factors identified in
these sections involve fact-intensive inquiries that are best
reserved for consideration at trial, after all the facts have been
developed.  However, it does not identify, even generally, the
facts necessary to the center of gravity analysis that require
further development.

22

opened and maintained by Dreyfus.  Courts have held that in conflicts analysis, "when dealing with damages issues, 'the place of the parties' domicile is of primary importance, for that is the State which presumably will feel the social and economic impact of recovery or nonrecovery.'"  Johnson v. Ford Motor Co., 2003 WL 22317425, at 3 (N.D. Ill. 2003) (citation omitted) (reiterating that "the place of domicile is significant when addressing damages that apportion fault").  Of particular importance where the issue is allocation of fault is the domicile of the party whose liability is at issue, because that state's laws both bear on that party's expectations and the state's interest in deterrence.

As for the relative interests of the involved states, Mississippi's only interest is in ensuring that the Mississippi plaintiffs are adequately compensated.  It has little or no interest in protecting the nonresident Dreyfus.

For its part, Dreyfus argues that New York has "no interest in seeing its rules imposed to the disadvantage of one of its residents in a foreign forum."  That plainly is not the case.  New York has an undeniable interest in its rule of joint and several liability for economic damages where the defendant is a New York domiciliary, because New York has an interest "'in assuring that its domiciliaries perform their duties and obligations.'"  See Clawans v. United States, 75 F. Supp. 2d 368, 373 (quoting Mueller v. Parke Davis, 252 N.J. Super. 347, 354, 599 A.2d 950 (App. Div.

23

1991) (recognizing New Jersey's interest in deterrence of tortious misconduct as a relevant factor in choice of law decisions applicable where two of defendants were New Jersey residents from whom damages were sought for their negligent acts in New Jersey). The cases recognizing the interest of the defendant's domiciliary state in deterrence as of primary importance on apportionment of fault issues are numerous.  See, e.g., Matter of Colorado Springs Air Crash, 867 F. Supp. 630, 635 (N.D. Ill. 1994) ("We find that the principal place of business is the most significant contact for the question of whether applying joint and several liability will deter negligent behavior.  States have a significant interest in controlling the behavior of companies domiciled within their borders."); In re Air Crash Disaster at Washington, D.C., 559 F. Supp. 333, 352 (D.D.C. 1983) ("[T]he primary purpose of a comparative fault apportionment rule is not to punish or deter, but to ensure fair treatment of defendants.  As such, with respect to this issue, a state where the conduct or injury took place is not necessarily the state of the most significant relationship; rather, it is likely to be a state in which a protected defendant is located.").

"The protection of justified expectations" is another relevant factor to consider.  At the time of its conduct, Dreyfus could have had no expectation, must less any "justified" expectation, that it would benefit from Mississippi law.  Its

24

"justified expectation" can only be that its conduct, and liability for any negligence on its part, would be governed by New York law, given New York is where it is headquartered and does business, and where the relationship out of which the claims against it are based was centered.[9]  That is to say, the court agrees with the Receivers that New York is the only state that can fairly be characterized as a "center of gravity" on the issue of how the Regulators' conduct affects Dreyfus's liability for its own alleged misconduct, and Dreyfus cannot reasonably complain about the application of New York law to determine the extent of its liability.[10]  As New York law does not permit apportionment of fault in the circumstances presented, it follows that the Receivers' motion for judgment on the pleadings as to Dreyfus's apportionment of fault defense is well taken.

---

[9]     That being the case, it is difficult to fathom the basis of Dreyfus's argument that application of New York law, rather than Mississippi law, would strip it of "procedural protection in a foreign forum in [an] ad hoc manner. . . ."

[10]     It has been recognized, as well, that the comparative fault scheme that applies usually will follow the law that applies to the issue of liability.  See Wallace v. Ormsby Trucking, Inc., 2005 WL 1021550, at *4 (E.D. Mo. May 2, 2005) (where issue was which state's comparative negligence law would apply, court did "not believe that the law applicable to apportionment of fault should be given greater consideration than the law governing the primary issue of liability").  It certainly seems likely that the issue of Dreyfus's liability will be determined by New York law, for it operated in New York and its activities with respect to the subject accounts appear to have been undertaken primarily, if not solely, in New York.

25

Accordingly, it is ordered that plaintiffs' motion for judgment on the pleadings as to Dreyfus's apportionment of fault defense to plaintiffs' negligence-based tort claims is granted.

SO ORDERED this 26th day of May, 2006.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE