UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

GEORGE DALE, COMMISSIONER OF INSURANCE
FOR THE STATE OF MISSISSIPPI, IN HIS
OFFICIAL CAPACITY AS LIQUIDATOR OF
FRANKLIN PROTECTIVE LIFE INSURANCE
COMPANY, ET AL.
VS.                                  CIVIL ACTION NO. 3:00CV359TSL-JCS

ALA ACQUISITIONS I., INC., ET AL.                        DEFENDANTS

MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendant
Dreyfus Service Corporation (Dreyfus) for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure.
Plaintiffs have responded to the motion and the court, having
considered the memoranda of authorities, together with
attachments, submitted by the parties, concludes that the motion
should be granted.[1]

As characterized by plaintiffs, this case arises out of a
scheme masterminded by Martin Frankel to "loot" more than $200
million from seven insurance companies.  The plaintiffs are the
Commissioners and Directors of the Departments of Insurance for
the states of Mississippi, Tennessee, Missouri, Oklahoma and
Arkansas, in their official capacities as the liquidators/
receivers/rehabilitators of the seven insurance companies
(hereafter collectively referred to as Plaintiff Receivers), and

---

[1]     A number of other motions are pending, but those motions
are moot in light of the court's conclusion that Dreyfus is
entitled to summary judgment.

the defendants are Martin Frankel and numerous individuals, foundations, trusts and corporations, including Dreyfus, alleged to have been involved in the scheme in one way or another.[2]

     According to plaintiffs, Frankel's scheme to defraud the insurance companies began in 1991, lasted nearly ten years, involved the participation of dozens of co-conspirators and ultimately resulted in the insolvency of the Insurance Companies. In broad terms, the scheme worked in this way:  Frankel obtained control of the Insurance Companies and once in control, placed two of his co-defendants in positions of authority as CEO and CFO, respectively.  Those defendants then stole the Insurance Companies' money through a series of financial transactions.  To commit their fraud without detection, Frankel created sham companies, used alias identities and had numerous mailing addresses for phony companies and identities.  These defendants transferred the money from the Insurance Companies to banks or brokerage houses in the United States and from there, transferred the money to foreign banks, usually in Switzerland.  They then transferred the money back to the United States where it was converted to untraceable cash for their own use and to fund their fraudulent scheme.

-------

     [2]   This court has previously entered a number of opinions in this case from which it has drawn most of its recitation of facts.

Regarding Dreyfus, plaintiffs allege that between 1994 and 1999, Frankel, using the alias "Eric Stevens," opened thirteen mutual fund accounts at Dreyfus and used those accounts to loot and launder the Insurance Companies' funds through wire transfers to and from an account in the name of Bloomfield Investments that he controlled at Banque SCS Alliance in Switzerland.  Frankel, the complaint alleges, controlled all of the Dreyfus accounts and gave standing wire instructions to Dreyfus directing how the Insurance Companies' funds were to be transferred to the Swiss account, pursuant to which over $480 million was wired from the Dreyfus accounts to Frankel's Swiss bank.

As for the particulars of Dreyfus's involvement, the record discloses the following:  From 1989 to 1991, Frankel fraudulently solicited $11 million for investment in funds he called Creative Partners.  By 1991, he had dissipated $5 million of that amount. To avoid exposure of the Creative Partners scheme, Frankel began to explore alternative sources for funds.  In this effort, Frankel engaged a Tennessee lawyer, John Jordan, who in turn involved a Tennessee businessman, John Hackney, to assist him on a confidential basis in locating a bank to purchase.  When that proved unsuccessful, Frankel, with the assistance of Jordan, Hackney, an accountant named Gary Atnip, and others, contrived a scheme to purchase insurance companies.

In 1991, prior to acquiring control of the first insurance company, Frankel anonymously purchased a registered broker-dealer firm called Liberty National Securities, Inc. (LNS). Frankel paid a nominee to be the figurehead of LNS and to keep the company registered and in good standing with the SEC and NASD. The same year, Frankel acquired Franklin American Corporation (FAC), which owned Franklin American Life Insurance Company (FAL). Frankel concealed his funding and control of the purchase by using a front entity, Thunor Trust, as the purchaser. Hackney, Atnip and Jordan assisted Frankel in the fraudulent use of the Thunor Trust and acquisition of FAC/FAL. Following the purchase of FAC, Hackney assumed the positions of president, chief executive officer and chairman of the board of directors of FAC and FAL; Atnip became the chief financial officer of FAC and FAL; and Jordan served as counsel to both companies. Each was paid by Frankel for their loyalty and protection.

Within a year of gaining control of FAL, Frankel caused $24.9 million of its assets to be liquidated through a series of transfers, sent to an account he controlled at Banque SCS Alliance, SA., in Geneva, Switzerland. Frankel, through Hackney, Atnip and regulatory filings, led FAL and state insurance regulators to believe that FAL's assets were being invested in U.S. Treasury securities through LNS.

In December 1993, Frankel, assisted by Hackney, Atnip and Jordan, caused FAC to purchase Family Guaranty Life Insurance Company (FGL) with proceeds from the looting of FAL, following which he began looting FGL.  Over the next five years, Frankel and his coconspirators, using proceeds looted from other insurance companies, acquired additional insurance companies.  In March 1994, he had FAC purchase Farmers and Ranchers Life Insurance Company (FRL); in July 1994, FAC purchased International Financial Services Life Insurance Company (IFS); in March 1995, FAC purchased Protective United Assets, the parent company of Protective Services Life Insurance Company, which was renamed Franklin Protective Life Insurance Company (FPL); in February 1998, a Frankel-created holding company, International Financial Corporation (IFC), purchased First National Life Insurance Company of America (FNL); and in February 1999, FAL purchased Old Southwest Life Insurance Company (OSL).  Shortly after each Insurance Company was acquired, Frankel liquidated its invested assets and caused the proceeds to be transferred from the company's Tennessee bank account to one of a number of Dreyfus accounts, and then, usually within a matter of days, to his single, commingled Swiss bank account.

Frankel's dealings with Dreyfus began in March 1994, when Frankel, as "Eric Stevens," an alias he used throughout his dealings with Dreyfus, submitted an application to the Dreyfus

Basic Money Market Fund to open an account in the name of LNS, Inc.  The application, purportedly signed by "Eric Stevens," as president of LNS, and by Sandy Johnson (an alias for Frankel co-conspirator Sonia Howe), as secretary for LNS, included LNS's business address and phone number, and identified persons who were authorized to act on behalf of LNS, including Stevens.  In the application, Frankel/LNS checked the box indicating he wanted wire redemption privileges for the account, which allowed the customer to receive redemption proceeds by FedWire to Federal Reserve member banks.  The wire redemption instructions provided on the application were set forth as follows:

```
Chase Manhattan Bank ABA #021 000 021
For Credit to: Brown Brothers Harriman #920-103323
FFCT: BSCSASA #1790781
For Final Credit reference to LNS, Inc.
```

Frankel/LNS wired $1,100,000 from FGL's Tennessee bank account to fund the account, and the next day redeemed all but $15 of the shares and had the proceeds wired to his Swiss bank account.

This initial account opened by Frankel/LNS was a retail money market fund designed for "savers," and yet throughout the time he used the account, Frankel/LNS continued a pattern of large purchases and rapid redemptions.  In October 1994, Frankel/LNS opened a separate account in the name of LNS in the Dreyfus Cash Management Plus Fund, an institutional cash management (money market) fund.  Frankel, as Stevens, opened this account over the phone, and provided the representative in Dreyfus's Institutional

6

Services Group the same customer information, taxpayer identification number and wire redemption instructions already in place for the LNS Basic Money Market Fund account.  Upon opening this account, LNS was assigned a customer identification number, known within Dreyfus as a "dealer code," which then permitted it to open additional accounts within the same institutional cash management fund or to open new accounts in other Dreyfus cash management funds.

This, Frankel did, as he opened a total of twelve accounts in Dreyfus institutional cash management funds between October 1994 and May 1999.  Prior to 1998, all the accounts Frankel opened at Dreyfus were in the name of LNS, Inc.  However, beginning in 1998, Frankel/LNS opened five accounts using the initials of some of the Insurance Companies, and providing the respective Insurance Company's taxpayer identification number and address.

The Receivers charge that from the opening of the accounts to the processing of trades, Dreyfus's "lax procedures and lack of concern about the parties with whom it did business paved the way for Frankel to loot and launder the Insurance Companies' funds." They allege that despite knowledge that all the funds in the accounts belonged to the Insurance Companies, Dreyfus allowed "Stevens," as the purported president of LNS, Inc., to transfer hundreds of millions of dollars from the accounts to Frankel's Swiss bank account without doing any due diligence, such as

requesting standard information from the Insurance Companies like board resolutions or other documentation authorizing "Stevens" to control the accounts or showing the purported relationship between the Insurance Companies and LNS, Inc. or "Stevens."  Further, based on allegations that Dreyfus knew that funds from the accounts were wired to the Swiss bank through a complex series of extraordinary transfers, that funds were held in the Dreyfus accounts for only a short period of time, that the Insurance Companies' funds were commingled in the account held in the name of LNS, Inc., that attempts were made to disguise the source of funds that were being transferred, and that little or no trading activity occurred in the accounts, plaintiffs charge that Dreyfus knew that money laundering or other illegal activity was occurring in the accounts, and thus, plaintiffs have charged Dreyfus with violating the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), negligence, breach of contract and breach of fiduciary duty.  Dreyfus has now moved for summary judgment on all of the claims of the Receivers.

The LNS/IFC Accounts

Dreyfus maintains that summary judgment is in order on plaintiffs' negligence claims relating to the eight Dreyfus accounts opened by Frankel/LNS in which shares were registered in the name of LNS or IFC because as to those accounts, Dreyfus owed a duty of care only to its customer, LNS/IFC, and owed no duty of care to the Insurance Companies, who were not Dreyfus customers or Dreyfus mutual fund shareholders.[3]

To establish a claim for negligence under New York law,[4] a plaintiff must prove that "'the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a proximate result of that breach.'" Renner v. Chase Manhattan Bank, No. 98 Civ. 926(CSH), 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999) (quoting King v. Crossland Savings Bank, 111 F.3d 251, 259 (2d Cir. 1997)). The general rule in New York, as in most jurisdictions, is that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship. See Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006) ("As a general matter, '[b]anks do not owe

---

[3]     The question whether a duty is owed is a question of law for the court. McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997).

[4]     Dreyfus contends that New York law applies to resolution of the state law issues presented herein; plaintiffs contend there is no choice of law issue presented because there is no conflict between Mississippi and New York law on any of the relevant issues.

non-customers a duty to protect them from the intentional torts of their customers.'") (citation omitted); <u>OSRecovery, Inc. v. One Groupe Intern., Inc.</u>, 354 F. Supp. 2d 357, 371 n.102 (S.D.N.Y. 2005) ("[B]anks generally do not owe a duty, fiduciary or otherwise, to noncustomers with whom they have no direct relationship."); <u>Renner</u>, 1999 WL 47239, at 13 ("[A] bank owes no . . . duty to a non-customer third-party" to prevent the bank's customer from defrauding such third-party); <u>see also Eisenberg v. Wachovia Bank, N.A.</u>, 301 F.3d 220, 224-27 (4th Cir. 2002) (concluding that North Carolina would adopt rule followed in other jurisdictions that a bank owes no duty of care to a noncustomer who is defrauded by the bank's customer through use of its services) (citing cases from Colorado, Rhode Island, Texas, California, Michigan, New Jersey, New York and Massachusetts); <u>Guidry v. Bank of LaPlace</u>, 740 F. Supp. 1208 (E.D. La. 1990), <u>modified</u>, 954 F.2d 278 (5th Cir. 1992) ("[I]t is well established Louisiana law that a bank, such as [Bank of Louisiana] BOL, owes absolutely no duty, fiduciary or otherwise, towards third persons with whom a BOL customer does business."); <u>McCallum v. Rizzo</u>, No. 942878, 1995 WL 1146812 (Mass. Super. Ct. Oct. 13, 1995) (bank's "duty is owed exclusively to the customer, not to the persons with whom the customer has dealings").

The Receivers do not dispute that the Insurance Companies were not direct customers of Dreyfus with respect to the LNS/IFS

accounts at issue.  They claim, however, that, contrary to the position urged by Dreyfus, New York law does not limit the duty of care owed by financial institutions to their customers.  Rather, according to the Receivers, under New York law, when a financial institution knows its customer is investing funds on behalf of another person or entity, as, for example, in the case of a fiduciary or trustee, the financial institution owes a duty of care directly to the owner of the funds where circumstances exist sufficient to cause the financial institution to know or be on notice that the funds are being misappropriated.  They submit that the facts in this case clearly establish that Dreyfus knew funds of the Insurance Companies were being invested in the LNS accounts and that there were "clear red flags" suggesting that Frankel/LNS was misappropriating the Insurance Companies' money, so that Dreyfus had a duty to make reasonable inquiry and endeavor to prevent a diversion.

The cases which the Receivers urge as support for the conclusion that Dreyfus owed them a duty with respect to the LNS accounts, Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759 (1916), Home Savings of America, FSB v. Amoros, 233 A.D.2d 35, 38, 661 N.Y.S.2d 635, 637 (N.Y. App. Div. 1st Dep't. 1997), and Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006), are inapposite, for as is clear from the following, these cases recognize only a limited extension of the duty of care for fiduciary accounts.

11

New York cases uniformly hold that "[a]s a general rule, a bank has no duty to monitor even a fiduciary account." Renner, 1999 WL 47239, at 14.[5]  That is, a depository bank ordinarily "has no duty to monitor fiduciary accounts maintained at its branches to safeguard the funds in those accounts from fiduciary misappropriation." Home Savings of America, FSB v. Amoros, 233 A.D.2d 35, 38, 661 N.Y.S.2d 635, 637 (N.Y. App. Div. 1st Dep't. 1997).  See also In re Knox, 64 N.Y.2d 434, 437, 477 N.E.2d 448, 450, 488 N.Y.S.2d 146, 148 (N.Y. 1985) ("In general, a bank may assume that a person acting as a fiduciary will apply entrusted funds to the proper purposes and will adhere to the conditions of the appointment.  A bank is not in the normal course required to conduct an investigation to protect funds from possible misappropriation by a fiduciary . . . .).  However, where there are facts indicating misappropriation, a bank "may be liable for participation in the diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." In re Knox, 64 N.Y.2d at 437, 477 N.E.2d at 450, 488 N.Y.S.2d at 148.

In Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759 (1916), perhaps the first case extending the duty of care in this manner, the executor of an estate deposited the estate's money in

---

[5]    The parties agree that cases addressing the duties owed by banks apply to similar financial institutions, such as Dreyfus.

the Bowery Bank in the name of the "Estate of Josephine F.
Schneider by H.F.W. Poggenburg, Executor."  Poggenburg had a
deposit account, as an individual, at the defendant Yorkville Bank
and over a span of three years, he mailed to Yorkville Bank some
thirty checks drawn on the estate account at Bowery Bank payable
to Yorkville Bank, which were credited to Poggenburg's individual
account with Yorkville Bank; in turn, the moneys in Poggenburg's
individual account were used to pay Poggenburg's promissory note
to Yorkville Bank.  After Poggenburg was removed as executor, the
new executor brought suit against Yorkville Bank to recover the
sum of the checks.  The court recognized that as executor,
Poggenburg held legal title to the estate funds and had full
control over their disposition, though he held them in trust, as a
fiduciary, to pay the debts and execute the will of the testator.
The court held that inasmuch as Poggenburg had title to the estate
funds, his deposit of the funds into his individual account did
not, in and of itself, constitute a conversion.  The court stated,
however, that,

> [i]nasmuch as the defendant knew that the credits to
> Poggenburg created by the proceeds of the checks were of
> a fiduciary character and were equitably owned by the
> executor, it had not the right to participate in a
> diversion of them from the estate or the proper purposes
> under the will.  Its participation in a diversion of
> them would result from either (a) acquiring an advantage
> or benefit directly through or from the diversion, or
> (b) joining in a diversion, in which it was not
> interested, with actual notice or knowledge that the
> diversion was intended or was being executed, and
> thereby becoming privy to it. . . .

13

Id. at 111, 761.  The court found that, generally speaking, a bank "has the right to presume that the fiduciary will apply funds to their proper purposes under the trust."  Id. at 111, 760. Indeed, even when the depositor is drawing checks which the bank may surmise and suspect are for his personal benefit, it is bound to presume that they are properly and lawfully drawn, "in the absence of adequate notice to the contrary."  Id. at 113, 762. "Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly."  Id.  Thus, in Bischoff, because Yorkville Bank knew that Poggenburg "was using the money of the executor for his individual advantage and purposes," namely, to pay his promissory note to Yorkville Bank, it therefore had a duty to endeavor to prevent a diversion, which it failed to do.  Id. at 113-14, 762.

Similar facts were presented in Grace v. Corn Exchange Bank Trust Company, 2878 N.Y. 94, 38 N.E.2d 449 (1941), with the same result.  There, one Kittredge secured two loans from the Corn Exchange Bank, a $100,000 loan for his corporation and a $35,000 personal loan.  Kittredge contemporaneously opened a personal account and an account for the corporation at the bank.  Two months later, Kittredge was named as successor trustee under the will of David Fox, in which capacity he received estate assets valued around $450,000.  As trustee, Kittredge opened an account at the Corn Exchange Bank in which he deposited proceeds from the

14

sale of estate assets.  Over a period of time, Kittredge, as
trustee, drew 146 checks on the estate trust account, payable to
himself, which he deposited into his personal account.  In turn,
he withdrew over half of the money so deposited through checks
made payable to himself.  In addition, the Corn Exchange Bank
received approximately $15,000 drawn from Kittredge's personal
account in payment on the loans the bank had made to Kittredge and
in payment of overdrafts on Kittredge's personal account.

> Addressing the successor trustee's claim for recovery of the
estate moneys Kittredge had embezzled, the court began by noting,

> [T]he bank was under no duty to exercise vigilance to
> protect the trust estate from possible embezzlement by
> the trustee.  When it accepted the trust account in
> which the trust funds were deposited, it assumed the
> obligation to pay out the moneys deposited in accordance
> with the directions of the trustee.  It assumed no other
> obligation.

Id. at 103, 453.  The court went on to explain that in order for
the bank to become jointly liable for the derelictions of the
trustee, "the plaintiffs must prove that the bank gave to the
wrongdoer such assistance as would make the bank a participant in
the wrong.  Proof that the bank failed in care is insufficient."
Id. at 102, 452.  The court recognized that the bank had assisted
Kittredge in stealing the trust money of the estate by crediting
his personal account with the amount of checks drawn by Kittredge
on the trust account.  "Even so," the court wrote, "unless in
addition it appears that the bank knew that the trustee was

15

engaged in embezzling trust funds by withdrawal of the trust money in the personal account in order to apply them to his own use, the bank was justified in following the directions of the trustee." Id. at 102, 453.  Thus, the bank was not liable for amounts it applied to cover Kittredge's overdrafts.  However, applying Bischoff, the court found that the bank was jointly liable with Kittredge for the wrongful diversion of estate funds which it had accepted as payment on Kittredge's personal loans with knowledge that Kittredge was wrongfully using estate moneys to pay the loan, stating, "The bank becomes liable as a joint wrongdoer [when] it knowingly assists the trustee in withdrawing the trust moneys from the personal account in order to pay a personal debt of the trustee to the bank."  Id. at 106, 454.

Home Savings of America, FSB v. Amoros, 233A.D.2d 35, 661 N.Y.S.2d 635 (1997), relied on by the Receivers, involved a law firm's mortgage trust account at National Westminster Bank from which one of the firm's partners embezzled more than $900,000. The law firm used the account to handle home mortgage closings for Home Savings Bank.  Prior to a mortgage closing, the lender would deposit into the trust account a bank check covering the amount to be paid out at the closing, and in turn, the law firm, by its partners, would draw checks on the account to disburse the funds needed at the closing.  Often, Home Savings would deposit the funds so close to the time of closing that the funds would not

16

have been collected as of the time of the closing.  When that occurred, National Westminster would cover Home Savings' check until it cleared.

Beginning in October 1994, one of the law firm's partners embezzled more than $900,000 from the account, writing forty-six checks on the account to himself which he, in turn, deposited into another National Westminster account.  National Westminster covered these checks in overdraft, notwithstanding that there had been no corresponding deposits by Home Savings.  Home Savings sued National Westminster to recover its losses.  The court stated the applicable rules in this way:

> Ordinarily, of course, a depository bank has no duty to monitor fiduciary accounts maintained at its branches to safeguard the funds in those accounts from fiduciary misappropriation.  Indeed, "[i]n general, a bank may assume that a person acting as a fiduciary will apply entrusted funds to the proper purposes and will adhere to the conditions of the appointment. . . .  There are recognized exceptions to the cited rule. . . .
> Notwithstanding the aforecited rule, a depository bank may still be held answerable for the loss of funds misappropriated from a fiduciary account if the bank, with knowledge of the fiduciary's diversion of trust funds, accepts such funds in payment of a personal obligation owed by the fiduciary to the bank (Grace v Corn Exch. Bank Trust Co., 287 NY 94, 102-103, rearg denied 287 NY 746) or the bank otherwise has actual knowledge or notice that a diversion is to occur or is ongoing (see, Matter of Knox, supra, at 438).  Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank (see, Newton v Scott, 254 App Div 140; Board of Mgrs. of Cont. Towers Condominium v Crestmont Mgt. Corp., 186 AD2d 49), and a bank's failure to conduct a reasonable inquiry when the obligation to do so arises

> will result in the bank being charged with such
> knowledge as inquiry would have disclosed (supra).

Id. at 39, 637.  The court determined that summary judgment could

not be entered for National Westminster because there were

indications in the record that the pilfering partner had used

trust funds to satisfy a personal debt to National Westminster.

Id. at 39, 637 (stating that if "trust account funds were applied

to the satisfaction of a personal debt owed by Amoros to NatWest,

NatWest would, under the holding of Grace, supra, be liable as a

participant in the embezzlement").  A fact issue was also

presented as to whether "chronic and extremely serious

insufficiency of funds in the mortgage trust account . . .

combined with the contemporaneous and roughly commensurate sapping

of that account into other NatWest accounts plainly being used by

the account fiduciary, Amoros, for non-trust purposes, was

sufficient to place NatWest on notice of the misappropriation."

Id. at 40-41, 638 (also noting that account insufficiency must

rank very highly among indicia of fiduciary misappropriation,

"revealing as it does a telling disparity between entrusted funds

and fiduciary expenditures which, in turn, may be, and often is,

indicative of trust withdrawals for nontrust purposes").

The plaintiffs in Lerner, 459 F.3d 273, investors who had

been defrauded by lawyer David Schick as part of a multi-million-

dollar Ponzi scheme, sued the defendant banks alleging they had

assisted Schick by failing to report his overdrafts on attorney

fiduciary accounts, as required by state law.  According to the plaintiffs' complaint, although Schick had represented to them that he would deposit the entrusted funds in "escrow" accounts, in fact, he did not do so and instead deposited their funds in attorney trust accounts, and then promptly raided those accounts. In so doing, he wrote numerous checks on the accounts that had insufficient funds to cover them; the banks honored the checks despite the insufficient funds by extending automatic loans to cover the overdrafts.

The court in Lerner acknowledged the position of two of the defendant banks that the relevant accounts at their banks were not properly designated as attorney fiduciary accounts; but the court noted that the plaintiffs had alleged that the banks had actual knowledge that the accounts were intended to be trust accounts for client funds and the court therefore assumed, for purposes of defendant's Rule 12(b)(6) motion, that the accounts were, in fact, trust accounts, as the plaintiffs alleged.  Id. at 281 n.2.  The court's analysis of the banks' potential liability thus proceeded from the premise that the accounts at issue were attorney fiduciary accounts.  The court held, "Once Schick began repeatedly to overdraw on his attorney trust accounts at a defendant bank, that bank had a duty under Home Savings to make reasonable inquiries and to safeguard attorney trust funds from Schick's misappropriation."  Id. at 289.

In each of these cases, the court found that a duty of care was owed to a noncustomer because of the nature of the account involved, i.e., a fiduciary account.  Contrary to the Receivers' urging, these cases do not hold or imply that such a duty arises in favor of the noncustomer owner of funds simply because the bank knows its customer is investing funds that belong to a third party.  This distinction was made abundantly clear in <u>Renner v. Chase Manhattan Bank</u>, No. 98 Civ. 926(CSH), 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999), and in <u>Tzaras v. Evergreen International Spot Trading</u>, No. 01 Civ. 10726(LAP), 2003 WL 470611 (S.D.N.Y. 2003), in each of which the court determined no duty was owed to a noncustomer because the account at issue was not a fiduciary account.

In <u>Renner</u>, the plaintiff filed suit alleging he was defrauded out of $3 million by one Gustav Susse and others.  According to the complaint, Susse opened an account at Chase Manhattan Bank through a senior vice-president, Michelino Morelli, in the name of Townsend Financial, and persuaded Renner to invest $3 million for trades of medium term bank debentures, guaranteeing him an annual return of 120%.  Renner was told the funds he invested would be kept in a sub-account of Townsend at Chase.  In reliance on this representation and others, Renner transferred the funds by wire to Morelli's attention at Chase, specifically indicating they were for the promised Renner sub-account to Townsend's account.  Chase

advanced the funds to Townsend and although it raised concerns to
Townsend about the proposed transaction, Chase, through Morelli,
nevertheless wired all of Renner's money to associates of Susse
who were involved in the scheme to defraud Renner.  Renner was
never apprised of Chase's concerns nor informed of activity in the
account.  After subsequent unsuccessful attempts by Renner to
secure the return of his money from Susse, he filed suit against
Susse, Townsend, Morelli and Chase.  Among other things, Renner
alleged that by accepting his funds, Chase owed him a duty of care
in connection with the funds, which it negligently breached by
failing to protect the funds from fraudulent diversion.  The court
dismissed the claim, stating,

> Plaintiff's negligence claim against Chase fails because
> Chase did not owe plaintiff a cognizable duty of care.
> Whatever duty of care banks owe to their customers,
> Renner was not a customer of Chase.  The Chase customer
> involved in this case was the Townsend fund, into which
> Chase (acting through Morelli) paid Renner's funds when
> they were received through Renner's Swiss Bank.
>
> These circumstances reduce Renner to the necessity of
> arguing that Chase owed him a duty to prevent Chase's
> customer, Townsend, from defrauding Renner.  But it is
> well settled that a bank owes no such duty to a
> non-customer third-party.

Id. at 13.[6]

-----

[6]     The New York cases cited by Renner supporting the latter
proposition are numerous.  See Century Business Credit Corp. v.
North Fork Bank, 246 A.D.2d 395, 396, 668 N.Y.S.2d 18, 19
(N.Y.App. Div. 1st Dep't 1998) (holding that bank is not liable
for negligence to customer's creditors, and stating that requiring
a bank to monitor its customer's account would "unreasonably
expand banks' orbit of duty."); Stuart v. Tomasino, 148 A.D.2d

The court acknowledged cases cited by Renner, namely Home Savings and In re Knox, in which banks had been found subject to liability for the diversion of fiduciary funds, but it found them inapplicable, stating:

> In the case at bar, these principles avail plaintiff nothing. First, the Townsend Fund account with Chase was not a fiduciary account; accordingly, there is no reason to depart from the general rule that a bank cannot be held accountable for the ways in which its customers manage their accounts. Further, even if one assumes a fiduciary relationship, plaintiff has not pleaded facts sufficient to establish negligence. In those instances in which the New York courts have found that a bank has received adequate notice of a fraud, either the bank has accepted money from a fiduciary account in order to satisfy the fiduciary's personal debt to the bank, see Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759 (N.Y. 1916); In re Knox, 64 N.Y.2d 434, or there is a history of overdrafts in the fiduciary account. Home Savings of America, N.Y.S.2d at 637. Here, there is no allegation that any payment was made to Chase; nor is there any allegation that the Townsend account ever was overdrawn. Accordingly, plaintiff has not shown that Chase had notice of an impending or ongoing misappropriation.

Id. at 14.[7]

---

370, 539 N.Y.S.2d 327 (N.Y.App. Div. 1st Dep't 1989) (no duty of care owed by mortgagee bank to mortgagors in action by mortgagors against individuals who had defrauded them, resulting in default on mortgage); Regency House, Inc. v. Citibank, N.A., 202 A.D.2d 655, 657, 610 N.Y.S.2d 535, 536 (N.Y.App. Div.2d Dep't 1994) (shareholders of foreclosed property failed to establish any duty owed to them by bank for negligence arising from foreclosure); Cohen v. Standard Bank Investment Corp., Ltd., 1998 WL 782024, at *7 (S.D.N.Y.1998) (no duty of care owed by bank to investor in allegedly fraudulent scheme perpetrated by bank borrower).

[7]     The Receivers characterize Renner as "an unpublished district court decision that was implicitly overruled on this point by the Second Circuit in Lerner, which refused to find as a matter of law that no duty flowed to the 'noncustomer' plaintiffs, even though the bank accounts in which their funds were invested were not actually fiduciary accounts." Lerner did not implicitly

The court likewise dismissed the plaintiff's negligence claim in Tzaras v. Evergreen International Spot Trading, No. 01 Civ. 10726(LAP), 2003 WL 470611 (S.D.N.Y. 2003), finding that the bank owed him no duty.  In Tzaras, the plaintiff elected to invest in Evergreen International Spot Trading.  Among other things, Tzaras was told by representatives of Evergreen that his investment would be placed in a bank account maintained by First Equity at Chase and would be segregated into sub-accounts under his name.  Over a period of nearly two years, he wired approximately $1.7 million to Chase with wire instructions that the monies were to be deposited in First Equity's account with Chase "for further credit to" Tzaras.  Sometime after September 11, 2001, Tzaras learned that Evergreen was a sham entity that had been created to facilitate the theft of investor assets, and that the monies stolen had been transferred to secret bank accounts in Switzerland.  Tzaras sued Chase, alleging that Chase knew the sub-accounts in his name never existed, that a conflict existed between Tzaras's wire instructions and the actual accounts at Chase, and that Chase was negligent in accepting the wire transfers and in ignoring suspicious activities taking place in First Equity's account.  As in Renner, the plaintiff was not a customer of Chase; rather Chase's involvement "extended only insofar as it allowed the wire

overrule Renner, nor did Lerner suggest that accounts other than fiduciary accounts will support finding a duty owed to a noncustomer.

23

transfer from Tzaras to First Equity, Chase's customer, to be completed." Id. at 6.  The court thus concluded, as did the court in Renner, that under New York law, Chase owed no duty of care to Tzaras.  Id.

The fact that New York courts have recognized there are circumstances in which a bank may be held liable to a noncustomer third-party for its customer's diversion of funds from a fiduciary account does nothing to advance the Receivers' position in this case, because here, as in Renner and Tazaras, the Dreyfus LNS accounts were not fiduciary accounts.  Consequently, as to those accounts, Dreyfus clearly owed no duty to the Insurance Companies to prevent the "looting" and "laundering" of their funds by Frankel/LNS.[8]

### The Insurance Companies' Dreyfus Accounts

---

[8]     Although the Receivers' response is primarily a challenge to the import of Renner and Tzaras, they also argue that since the record evidence establishes that Dreyfus knew funds of the Insurance Companies were being invested in the LNS accounts, and since it is uncontested that Frankel, through LNS, purported to act as a broker for the Insurance Companies, there was at the very least "a fiduciary relationship on a transactional basis," so that even if a strict fiduciary relationship were required to support finding a duty of care extended to the Insurance Companies, a fact question exists concerning the nature of Frankel's/LNS's relationship with the Insurance Companies that cannot be decided on summary judgment.  However, plaintiffs have pointed to no evidence demonstrating that Dreyfus knew of a purported fiduciary relationship between LNS and the Insurance Companies.

24

While the majority of the Dreyfus accounts were opened by
Frankel/LNS in the name of LNS or IFC, beginning in 1998, LNS
opened five accounts, over the telephone, for each of which it
identified an insurance company to Dreyfus by giving the insurance
company's initials, or abbreviated name, mailing address and
taxpayer identification number and requested that the shares be
registered in the name of such entity.  Such accounts were opened
using the names of FNL, FGL, FAL and OSL.  The Receivers of those
four companies have alleged claims against Dreyfus for breach of
contract, negligence and breach of fiduciary duty.  Dreyfus seeks
dismissal of all these claims.

Dreyfus initially sought summary judgment on the breach of
contract claim on the basis that Dreyfus's contract was with LNS,
not with the Insurance Companies.  It took the position, moreover,
that even if there were some arguable basis for these Insurance
Companies' claiming rights arising from the Dreyfus/LNS contract
(as, for example, if they were contending that LNS acted as their
agent in contracting with Dreyfus or were suing as putative third-
party beneficiaries of the Dreyfus/LNS contract), they could not
prevail because they had identified no term of the contract which
Dreyfus was alleged to have breached.  In response to Dreyfus's
motion, the Insurance Companies explain that their contract claim
for the Insurance Company accounts is based on the Insurance
Companies' status as third-party beneficiaries of the master

account agreement between Dreyfus and LNS, and that they are claiming that Dreyfus breached the duty of good faith and fair dealing implied in every contract.  However, even assuming for the sake of argument that the Insurance Companies were third-party beneficiaries under the master account agreement and were owed a duty of good faith and fair dealing, they still have no cognizable claim for breach of contract.  Under New York law, parties to an express contract are bound by an implied duty of good faith; that duty also extends to a third-party beneficiary.  See Netrix Leasing, LLC v. K.S. Telecom, Inc., No. 00-CIV-3375(KMW), 2001 WL 228362, 12 (S.D.N.Y. 2001).  However, under New York law, breach of the duty of good faith and fair dealing "is merely a breach of the underlying contract."  Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992).  Thus, Dreyfus cannot be held liable for breaching a duty of good faith and fair dealing putative to third-party beneficiaries of the master account agreement for actions which it took in compliance with its affirmative contractual duties to LNS.

In connection with the Receivers' claim of negligence relating to the Insurance Company accounts, Dreyfus, citing Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 224-27 (4th Cir. 2002), and Weil v. First National Bank of Castle Rock, 983 P.2d 812 (Colo. App. 1999), argues that courts have declined to impose any duty of care on financial institutions to persons or entities

26

whose names were fraudulently used by others to open accounts.  By so arguing, it would seem Dreyfus is suggesting that these Insurance Companies were owed no duty of care by Dreyfus relative to these accounts, yet Dreyfus also argues that "[t]he case law imposes no duties on [Dreyfus] to any insurance company not fulfulled by [Dreyfus] acting as directed by LNS."  It then argues that "[w]ith respect to the subaccounts, LNS was [Dreyfus's] customer and the initialed entities (that is, the Insurance Companies) were viewed as LNS's designees for account or mutual share registration," so that Dreyfus's "relationship was with" LNS, which possessed authority over the accounts.

Dreyfus's apparent reliance on Eisenberg and/or Weil in support of the proposition that Dreyfus owed the Insurance Companies no duty of care is misplaced, as both cases are readily distinguishable.  Dreyfus's reliance on Eisenberg is particularly curious, for contrary to Dreyfus's suggestion, that case did not even involve the fraudulent use of the plaintiff's name to open an account.  Rather, the plaintiff in Eisenberg was the victim of a fraudulent investment scheme perpetrated by one Douglas Walter Reid, who falsely represented to Eisenberg that he was a senior vice president of Bear Stearns Companies, a large financial securities firm, and convinced Eisenberg to make a putative investment.  At Reid's direction, Eisenberg transferred $1,000,000 via electronic wire to a Wachovia branch bank in North Carolina

for deposit in an account bearing the name "Douglas Walter Reid dba Bear Stearns," "For Further Credit to BEAR STEARNS."  Wachovia accepted the transfer and deposited the funds to the credit of the specified account, which had been opened by Reid and was under his control.  Reid withdrew almost all of Eisenberg's funds and converted them to his own use.

Eisenberg sued Wachovia for negligence, alleging that it was negligent by reason of allowing Reid to open the "dba Bear Stearns" bank account, failing to discover Reid's improper use of the account and failing to train its employees to recognize and prevent fraud.  Id. at 223-34.  These claims included an allegation that Wachovia breached a duty of care owed to people like Eisenberg, who transacted with Wachovia customers, to detect and prevent the fraudulent use of its bank accounts.  The court dismissed the plaintiff's negligence claim, finding Wachovia owed him no duty of care.  Manifestly, the plaintiff in Eisenberg was not even arguably a customer of Wachovia and he did not claim to be one; rather he was a third party who merely transacted business with Reid, a Wachovia bank customer.

Weil is no more helpful.  In Weil, the plaintiff owned an insurance agency and did business as "Carl Weil Insurance" or "CWI Insurance."  His office manager and assistant office manager opened a checking account with First National Bank in their own names d/b/a CWI Insurance, using the assistant's social security

28

number.  They then used the checking account at First National in

a scheme to embezzle funds from CWI's legitimate business accounts

at two other banks by having the office manager write checks on

those accounts to CWI, depositing them in the account at First

National, and then writing checks on that account for their own

purposes.  Weil sued First National for negligence, claiming that

it owed him duties to

> "inquire as to the authority of the agent to set up the
> account, deposit the forged checks and for the
> withdrawal of the money"; to "obtain a Taxpayer
> Identification Number from [the office manager and/or
> her assistant]"; to "obtain verification of the business
> name through third parties"; to "obtain verification by
> visit or by phone that the business exists"; to "obtain
> a trade name affidavit, articles of incorporation or
> partnership agreement"; to "obtain corporate resolution
> for opening an account or certification from owner of
> ability to do business with the bank"; and to "obtain
> certification from Colorado Secretary of State."

Id. at 814.  The court found no authority to support the

imposition of such duties, and concluded that it would not "create

a new common law duty burdening banks and financial institutions

with a duty to inquire into a customer's authority to use an

unregistered trade name."  Id.

The court in Weil emphasized that although the office

manager/assistant used the "d/b/a CWI Insurance" designation on

their personal account, "CWI Insurance" was not a separate and

distinct legal entity; it was just an unregistered trade name.

This was a determinative distinction in Weil, in which the

29

defendant bank's "customers" were the office manager and her assistant.

Here, in contrast, the Insurance Companies were separate and distinct legal entities, and were indicated as such by LNS to Dreyfus, which was provided not only the names and mailing addresses of the companies, but also the Companies' taxpayer identification numbers. Moreover, as noted by the Receivers, there is evidence indicating a recognition by Dreyfus that the Insurance Companies were its customers; Dreyfus sent monthly statements directly to the Insurance Companies, which included a notice explaining to the account holder that where the statement reflected a dealer code preceded by an asterisk, this meant "your dealer broker or financial institution has placed trades on your behalf."

In the end, Dreyfus does not appear to seriously dispute that these Insurance Companies had the status of customers of Dreyfus as to the sub-accounts, given LNS's election to register shares in names using these Insurance Companies' initials, accompanied by their tax identification number. Dreyfus argues, though, that even recognizing this "seeming status" for purposes of this motion, the Receivers of these Insurance Companies still have no viable negligence claim for one or more of a number of reasons.

Principally, it argues that any purported rights on the part of the Insurance Companies arose out of LNS's actions, given that

LNS established the accounts pursuant to its master account agreement with Dreyfus.  Therefore, it submits, its duty, both to LNS and to the Insurance Companies, was to conduct only authorized transactions as LNS directed, which it did.  In other words, it argues that "any assertion of account holder status directly arises out of the LNS-[Dreyfus] relationship, and this relationship itself constituted adequate authorization for the account transactions."  However, the only authority Dreyfus cites for this proposition is Johnson v. Chase Manhattan Bank, 2000 U.S. Dist. LEXIS 5587 (S.D.N.Y. 2000), apparently a magistrate judge's report and recommendation which the district court declined to adopt.

Dreyfus further argues that under the law and the facts presented, it had no duty to the Insurance Companies to investigate the source of the funds, see First Union Nat'l Bank v. A.G. Edwards & Sons, 691 N.Y.S.2d 491, 492 (N.Y. App. Div. 1999) (rejecting argument that broker-dealers had duty to investigate and ascertain the "provenance" of funds of which plaintiffs were defrauded, observing, "It would conflict with the strong public interest in maintaining the finality of payments of money in business transactions to require frequent inquiries by firms into the source of funds paid in the ordinary course of business.")[9];

_____

[9]    Cf. Banque Worms v. BankAmerica Intern., 77 N.Y.2d 362, 372 (N.Y. 1991) (observing that "'to permit in every case of the payment of a debt an inquiry as to the source from which the

nor was there any duty to monitor the accounts, see <u>De Kwaitkowski v. Bear, Stearns & Co., Inc.</u>, 306 F.3d 1293, 1302 (2d Cir. 2002) (holding a broker has no duty to monitor nondiscretionary accounts, and that the broker's duty ends when each customer-requested transaction is completed).  In this vein, it contends that under Article 4A of the Uniform Commercial Code, N.Y.U.C.C. §§ 4-A-101 <u>et</u> <u>seq.</u>, the sending of the wires themselves established the authority of the transfer of the Insurance Companies' funds, and that principles of apparent authority established Dreyfus's right to rely on LNS's authorization to deal with account funds and Dreyfus's consequent duty, in turn, to implement transactions as directed by LNS.  In short, it points out that after having been informed by Frankel/LNS that funds would be wired to the accounts from the Insurance Companies, the Insurance Companies did, in fact, wire the funds and direct their deposit in accounts controlled by LNS; and that Dreyfus transferred the funds in accordance with the directions in the transfer instructions.  Dreyfus submits that it was entitled to rely on LNS's apparent authority, that it was not obligated to "go behind" the representations made by LNS or the wire transfers, and that it therefore breached no duty to the Insurance Companies by

---

debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear'") (quoting <u>Hatch v Fourth Natl. Bank</u> (147 NY 184, 192)).

processing the transfers as directed by LNS.  Finally, it argues
that § 8-115 of the Uniform Commercial Code (adopted in New York
as N.Y.U.C.C. § 8-115 effective Nov. 10, 1997) expressly absolves
Dreyfus from liability for following LNS's instructions regarding
the accounts, and specifically as to redemption of shares.[10]  See
Pine Belt Enterprises, Inc. v. SC&E Administrative Servs., Inc.,
No. Civ.A. 04-105(SRC), 2005 WL 2469672 (D.N.J. Oct. 6, 2005).

In the court's opinion, Dreyfus makes a compelling argument
that Dreyfus breached no duty to the Insurance Companies in
establishing the sub-accounts, accepting funds transfers and
purchaseing shares as directed by LNS.  The more vexing question
is as to the nature and extent of any duty owed by Dreyfus to the
Insurance Companies with respect to redemption of the shares as
directed by Frankel/LNS; indeed, the Receivers argue that
regardless of LNS's authority to purchase and sell shares on
behalf of the Insurance Companies, Dreyfus breached a duty of care
to the Insurance Companies by redeeming shares as directed by LNS,
i.e., by transferring the proceeds of such sales to Frankel's
Swiss bank account.  A serious question is presented as to whether
Dreyfus had any duty to "go behind" LNS's directives to Dreyfus to

---

[10]    This section provides:
A securities intermediary that has transferred a
financial asset pursuant to an effective entitlement
order, or a broker or other agent or bailee that has
dealt with a financial asset at the direction of its
customer or principal, is not liable to a person having
an adverse claim to the financial asset.

bring the outgoing wire instructions to the attention of the
Insurance Companies for the purpose of verifying LNS's authority
to direct disbursement to the Swiss bank account. Yet regardless
of whether there was any such duty, in the court's opinion,
plaintiffs' claim fails because the evidence is insufficient to
support a finding that an inquiry of the Insurance Companies would
likely have revealed Frankel's scheme and thereby averted the
Insurance Companies' losses.

In this regard, as Dreyfus points out, Frankel completely
dominated the Insurance Companies, with the total acquiescence of
top management; and there is little doubt that had inquiry been
made, Frankel's coconspirators, Hackney, Atnip and Jordan, through
whom Frankel controlled the Insurance Companies, would have
ensured confirmation of LNS's complete authority to act on the
Insurance Companies' behalf with respect to the accounts. The
court does recognize the Receivers' argument that it is possible
such inquiry would have uncovered the fraud; but speculation will
not suffice. For this reason, the court concludes that
plaintiffs' negligence claim with respect to the sub-accounts
should be dismissed.[11]

_____

[11]   The court notes that Dreyfus also makes a persuasive
argument that any fiduciary duty that may have been owed the
Insurance Companies was not a broad, general fiduciary duty but
rather was limited to implementing trades as requested, which it
fulfilled.  For this reason, for the same reason the negligence
claim fails, the court concludes that plaintiffs' claim for breach
of fiduciary duty with respect to these accounts should be

RICO

In their complaint, the Receivers charge a conspiracy by
Dreyfus in violation of 18 U.S.C. § 1962(d), alleging that Dreyfus
"knew, or purposely contrived to avoid learning, that illegal
money laundering activity was taking place" in the Frankel/LNS
accounts and that Dreyfus "agreed to participate in the affairs of
the [Frankel] enterprises through a pattern of racketeering
activity."  Title 18 § 1962(d) makes it unlawful "for any person
to conspire to violate any of the provisions of subsection (a),
(b), or (c) of this section."  Section 1962(c), the substantive
provision which the Receivers allege was violated by Frankel and
others, forbids "any person employed by or associated with any
enterprise engaged in, or the activities of which affect,
interstate or foreign commerce, to conduct or participate,
directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity or collection
of unlawful debt."  The Receivers allege that Frankel and others
engaged in numerous predicate acts of mail and wire fraud and
money laundering demonstrating a pattern of racketeering activity.

In its motion, Dreyfus seeks dismissal of plaintiffs' RICO
claim against it, declaring that plaintiffs have "in no way
identified any basis for a RICO claim" and have thus failed to
state a RICO claim.  They argue that plaintiffs have pled their

dismissed.

putative claim in conclusory terms and have identified no underlying facts to support the claim in their complaint, RICO statement(s) and/or responses to discovery (which they failed to supplement).  They suggest that plaintiffs have failed to allege, much less prove, the elements of a claim under 1962(d), including the requirement that Dreyfus knew of and agreed to the overall objective of any putative substantive RICO offense, and further contend that in view of the lack of any alleged or substantiated factual basis for the claim, plaintiffs cannot prevail and summary judgment is therefore warranted.

In response, the Receivers first attack the sufficiency of Dreyfus's motion, urging the court to reject what they term Dreyfus's "vague and unsupported attack on the merits" of the 1962(d) claim.  They insist that Dreyfus has the burden to explain the basis for its motion and to identify specific evidence that supports the motion, which it has failed to do.

It is true that Dreyfus's motion on plaintiffs' RICO claim does little more than recite the elements of the claim and declare that plaintiffs, having failed to plead any factual basis for the claim, certainly cannot present proof sufficient to sustain their burden to prove the claim.  The motion in this regard could thus fairly be characterized as marginal; but in the court's opinion, it is also adequate.  Furthermore, though plaintiffs contend otherwise, there is no requirement that a defendant moving for

summary judgment identify or present specific evidence to support the motion.  On the contrary, "the burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."  Celotex v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  See also Sanders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991) (explaining that "[t]he moving party need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the moving party's case"); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 10 (2d ed. Supp. 2008) (under Celotex, "the moving party on a summary-judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case").  The court thus rejects plaintiffs' procedural objection to Dreyfus's motion.

Turning to the substance of the motion, the parties agree that to establish a RICO conspiracy under § 1962(d), the plaintiffs must prove "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." United States v. Sharpe, 193 F.3d 852, 869 (5th Cir. 1999).  Here, Dreyfus notes that under Reves v. Arthur Young & Co., 507 U.S. 170 (1993), it cannot be liable under § 1962(c), the substantive RICO

37

provision, because it did not "participate in the operation or management of the RICO enterprise itself." Id. at 183. See Reves, 507 U.S. at 179, 113 S. Ct. at 1170 (addressing § 1962(c), and holding that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, . . . one must have some part in directing those affairs"). In the court's opinion, there is no reasonable basis for contrary argument on this point. See Allstate Ins. Co. v. Seigel, 312 F. Supp. 2d 260, 274 (D. Conn. 2004) ("While a defendant need not be involved in the day-to-day operation of the enterprise, and indeed can be an outsider to the enterprise, a defendant will not be found to participate in the management or operation of the enterprise unless he is 'associated with [the] enterprise and participate[s] in the conduct of its affairs–that is, participate[s] in the operation or management of the enterprise itself.'") (citation omitted); Dep't of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp. 449, 466-67 (S.D.N.Y. 1996) ("Providing important services to a racketeering enterprise is not the same as directing the affairs of an enterprise. . . . [E]ven provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise.") (citation omitted); Redtail Leasing, Inc. v. Belleza, 95 Civ. 5191, 1997 WL 603496, at *5 (S.D.N.Y. Sept.30, 1997) ("A defendant does not 'direct' an

enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise.").  However, the fact that Dreyfus did not participate in the management or operation of the alleged RICO enterprise so that it can have no liability on the substantive RICO offense does not mean that it cannot be held liable for conspiracy under § 1962(d).  See United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998), cert. denied sub nom. Grajales Murga v. United States, 526 U.S. 1031, 119 S. Ct. 1280, 143 L. Ed. 2d 373 (1999) (holding that participation in operation or management of enterprise is not required for conspiracy conviction under § 1962(d)).  Cf. Salinas v. United States, 522 U.S. 52, 118 S. Ct. 469, 477, 139 L. Ed. 2d 352 (1997) (opining that RICO's conspiracy section is to be interpreted in light of the common law of criminal conspiracy, and holding that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense").[12]

_____

[12]   Dreyfus declares in its reply memorandum that "Plaintiffs must prove an agreement 'to commit a substantive RICO offense' to sustain a RICO claim."  Presumably it contends plaintiffs cannot sustain this burden because they have not and cannot legitimately charge that Dreyfus agreed to participate in the operation or management of Frankel's RICO enterprise(s). However, of the circuit courts addressing the issue, all but the Ninth have held that Reves' "operation or management" standard applies only to substantive RICO offenses under Section 1962(c) and not to a conspiracy to violate RICO under Section 1962(d). See Napoli v. United States, 45 F.3d 680, 683-84 (2d Cir. 1995); Smith v. Berg, 247 F.3d 532 (3d Cir. 2001); United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998); MCM Partners, Inc.

"A person cannot be held liable for a RICO conspiracy 'merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul.'"  Marlin v. Moody Nat. Bank, N.A., 248 Fed. Appx. 534, 2007 WL 2726893, at 3 (5th Cir. 2007) (quoting United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998)).

> "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  Salinas v. United States, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997).  In other words, the conspirator need not expressly agree to violate the statute, but he must have known and agreed to assist in the underlying criminal offense.  See United States v. Marmolejo, 89 F.3d 1185, 1196 (5th Cir. 1996), aff'd sub nom., Salinas, 522 U.S. at 65, 118 S. Ct. 469.  Therefore, [plaintiffs] must prove that [defendant] knew the criminal nature of [Frankel's/ LNS's] activities and intentionally acted to assist in the unlawful activity.

Id. (emphasis added).  That is, to succeed on this claim, plaintiffs must prove that Dreyfus knew and agreed to assist in Frankel's "underlying criminal offense" of money laundering.

Under the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful to conduct a financial transaction involving the proceeds of specified unlawful activity (including mail and wire fraud) knowing it is designed to conceal

---

v. Andrews-Bartlett & Assoc., 62 F.3d 967, 979 (7th Cir. 1995); United States v. Starrett, 55 F.3d 1525, 1547 (11th Cir. 1995), cert. denied sub nom. Sears v. United States, 517 U.S. 1111, 116 S. Ct. 1335, 134 L. Ed. 2d 485 (1996).

or disguise the nature, location, source, ownership or control of the proceeds.  See United States v. Giraldi, 86 F.3d 1368, 1372 (5th Cir. 1996).[13]  Accordingly, to establish its RICO claim against Dreyfus, the Receivers must establish that Dreyfus knew that the money funneled through the Dreyfus accounts was the product of unlawful activity and knew the transactions Frankel was directing were designed to conceal or disguise the nature, location, source, ownership or control of the funds that were the product of unlawful activity, and that Dreyfus intentionally acted to assist in accomplishing this.  In other words, they must prove that Dreyfus knew what Frankel was trying to accomplish and agreed to assist him.  Of course, plaintiffs do not have to show that defendant had full knowledge of all the details of the conspiracy, but they must show that it "possessed knowledge of . . . the general contours of the conspiracy."  U.S. v. Zichettello, 208 F.3d 72, 100 (2d Cir. 2000) (stating that while too little knowledge may undermine a conspiracy conviction, "there is no requirement that a defendant must have been omniscient").

_____

[13]   The substantive offense of money laundering requires proof:  "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds."  United States v. Maher, 108 F.3d 1513, 1527-28 (2d Cir. 1997).

As described by the Receivers, Frankel's "overall scheme involved defrauding the Insurance Companies by acquiring them while concealing his involvement, misappropriating their assets, and laundering the ill-gotten gains."  They maintain that the evidence as to the suspicious nature of Frankel's activities in the Dreyfus accounts is sufficient to establish that Dreyfus knew of and agreed to this overall objective.  That is, they argue that the facts would reasonably support a finding that Dreyfus knew that the transactions Frankel was directing, and which Dreyfus allowed and was implementing, constituted money laundering; but they argue alternatively that even if the evidence does not support a finding that Dreyfus knew of Frankel's money laundering, at the very least, it shows that Dreyfus, by turning a blind eye to the many "red flags" highlighting the obviously suspicious nature of Frankel's transactions, was "deliberately ignorant" of Frankel's money laundering.

The court recognizes that the elements of a conspiracy offense, including knowledge, may be established by circumstantial evidence.  See Posado-Rios, 158 F.3d at 857; United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992) ("The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances.").  In the court's opinion, however, the "collocation of circumstances" cited by the Receivers does not

42

support an inference that Dreyfus knew of and agreed to assist in Frankel's looting and laundering of funds belonging to the Insurance Companies.  Regardless of what Dreyfus could have known, or should have known, there is nothing in the record to suggest that Dreyfus, in fact, knew of Frankel's money laundering or that it agreed to assist him in money laundering.

Plaintiffs argue alternatively that knowledge and intent may be established through Dreyfus's "deliberate ignorance."  Put another way, "[t]he term deliberate ignorance 'denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught."  United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990).  "The key aspect of deliberate ignorance is the conscious action of the defendant-the defendant consciously attempted to escape confirmation of conditions or events he strongly suspected to exist.... [D]eliberate ignorance is reflected in a . . . defendant's actions which suggest, in effect, 'Don't tell me, I don't want to know.'" Id. at 951.  "Plaintiffs may employ a deliberate ignorance theory when (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." Marlin, 2007 WL 2726893, at 5 (citing Posada-Rios, 158 F.3d at 875, and Lara-Velasquez, 919

43

F.2d 946).  "According to the Fifth Circuit, under the deliberate ignorance test, the 'first prong [] protects a defendant from being convicted (or found liable) for what he should have known.'" Id. (quoting Lara-Velasquez, 919 F.2d at 952).  In other words, under the first prong, it is not sufficient to show merely that a reasonable person should have known of the underlying unlawful conduct; rather plaintiffs must present facts which support an inference that the defendant subjectively knew of the underlying unlawful conduct.  Id.

Plaintiffs contend it is reasonable to infer that Dreyfus was, in fact, aware that Frankel was likely engaged in money laundering given the suspicious circumstances surrounding his transactions, including the fact that funds were commingled, funds were transferred to the control of a third party, and the transactions had "highly irregular features."  See United States v. Sheperd, 396 F.3d 1116, 1120-23 (10th Cir. 2005) (identifying these factors as indicating that a person intends to conceal the source of funds).  They also point out that each of more than one hundred outgoing transactions was initiated by a telephone call placed by Frankel/Stevens to Dreyfus and on each occasion he spoke with a Dreyfus Client Specialist, who was thus certainly aware of his transactions; and they contend that a number of these conversations "underscore Dreyfus's knowledge of the highly irregular nature of Frankel's transactions."

44

However, at the same time, the Receivers point out in connection with their negligence claims that while Dreyfus had created anti-money laundering and suspicious activities policies, it never implemented those policies.  They argue, in fact, that "Dreyfus's failure to distribute and enforce its own policies led to a complete breakdown of compliance procedures and <u>a total lack of knowledge about money laundering on the part of the employees who were best situated to identify and stop Frankel's activities</u>," i.e., the Client Specialists.  (Emphasis added).  They continue their argument along these lines, declaring that "Dreyfus's Compliance Department wholly failed to ensure that Dreyfus employees received and read Dreyfus's policies relating to suspicious transactions."  And they note, in particular, that "[c]ountless Client Specialists who had direct contact with Frankel, and numerous other Dreyfus employees and managers, testified that they did not receive compliance handbooks and were not familiar with any suspicious transaction or money laundering policies in effect in the 1990's."  Moreover, they declare, "Dreyfus failed to train its employees to identify suspicious transactions or to recognize money laundering. ... Consequently, during the 1990's, some Dreyfus employees had no idea what money laundering was."

It bears repeating that plaintiffs cannot prove deliberate ignorance based on what Dreyfus should have known; rather, it

depends on proof of what Dreyfus subjectively knew.  In the court's opinion, it cannot be reasonably inferred that the same Dreyfus employees who were ignorant concerning money laundering and were untrained in and hence incapable of identifying suspicious transactions, were subjectively aware of the high likelihood that Frankel was engaged in money laundering.  It follows that plaintiffs cannot succeed on their RICO claim against Dreyfus.  See <u>Lara-Velasquez</u>, 919 F.2d at 952 ("The second prong of the deliberate ignorance test can be reached only if the first prong has been established," for a defendant cannot "purposely avoid learning of illegal conduct unless he [is] subjectively aware that the high probability of illegal conduct exists.").

<u>Conclusion</u>

Based on the foregoing, it is ordered that Dreyfus's motion for summary judgment is granted.

SO ORDERED this 31st day of March, 2008.

<u>/s/ Tom S. Lee</u>
UNITED STATES DISTRICT JUDGE

46